UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOHN MCKAY,**
      **Plaintiff,**

    v.

**SAFE AUTO INSURANCE GROUP, INC.,** *et al.***,**

      **Defendants.**

**Case No. 2:20-cv-1584**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on Defendants Safe Auto Insurance Group, Inc.'s ("Safe Auto") and Ronald Davies' ("Davies") (collectively "Defendants") Motion to Dismiss Plaintiff's Complaint. (ECF No. 22). Plaintiff John McKay ("Plaintiff") has responded, (ECF No. 25), and Defendants have replied. (ECF No. 28). Thus, the matter is ripe for review. For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss Plaintiff's Complaint. (ECF No. 22).

**I.**

As this matter is before the Court on Defendants' Motion to Dismiss, the factual allegations in the Complaint are taken as true and are as follows:

Plaintiff worked for Defendants as their Director of Internal Audit from January of 2014 until January 6, 2020. (Amend. Compl. at ¶¶ 11, 20, ECF No. 7). During that time Plaintiff reported directly to William Graves ("Graves") and indirectly to Davies.[1] (*Id.* at ¶¶ 20–21). As the Director of Internal Audit, Plaintiff was tasked with identifying, assessing, and addressing risk, and subsequently reporting his findings and recommendations to the Board. (*Id.* at ¶ 22). In January

---

[1] Davies is the Chief Executive Officer ("CEO") and a member of the Board of Directors (the "Board") at Safe Auto. (*Id.* at ¶ 21).

2019 during his last performance review, Plaintiff was rated as "exceeding expectations," a rating Graves explained was awarded based upon Plaintiff's work updating Safe Auto's enterprise risk assessment ahead of its planned initial public offering ("IPO"). (*Id.* at ¶¶ 24–25).

In late April 2019, Plaintiff noticed "anomalous" payments from Safe Auto to four recently engaged vendors (Vendors A, B, C, and D). (*Id.* at ¶ 29). Safe Auto was making large payments to these vendors, some in excess of $500,000, while seemingly receiving little production in return. (*Id.* at ¶ 30). Upon further investigation Plaintiff discovered that Safe Auto had contracted with these vendors atypically, without first issuing a request for proposal or allowing a formal bidding process. (*Id.* at ¶ 31). Plaintiff suspected self-dealing. (*Id.* at ¶ 33). Continuing his investigation, Plaintiff interviewed several of Safe Auto's IT Managers, three of whom informed Plaintiff they believed some or all of these vendors were paying kickbacks to Safe Auto's Chief Information Officer ("CIO"). (*Id.* at ¶¶ 34–35).

In June 2019, Plaintiff informed his supervisor, Graves, of his suspicions of fraud. (*Id.* at ¶ 37). Plaintiff advised Graves that he believed Safe Auto executives may be committing felony fraud by soliciting and/or receiving kickbacks from the four Vendors. (*Id.* at ¶ 38). That same month the CIO was terminated when the four Vendors failed to produce under their contracts. (*Id.* at ¶ 41). Subsequently, Safe Auto gave Plaintiff access to the now former-CIO's email account. (*Id.* at ¶ 42). Plaintiff discovered an email from July 2018, in which the CIO had asked Vendor A's CEO to pick up a check from the CIO's friend. (*Id.* at ¶ 43). Vendor A's CEO confirmed to Plaintiff that he had retrieved and delivered to the CIO a sealed envelope that he understood to contain a cashier's check. (*Id.* at ¶ 44). Plaintiff believed that this conducted suggested the existence of a criminally fraudulent scheme, and that the CIO had requested delivery in this manner to avoid mail fraud. (*Id.* at ¶¶ 46-47).

On July 1, 2019, Safe Auto received an anonymous email accusing Vendor A of stealing code and paying kickbacks to management, causing Plaintiff to request a private session with the Board. (*Id.* at ¶ 48). Plaintiff asked for this private session to avoid the presence of Davies at the meeting. (*Id.* at ¶ 49). That February, Davies had received direct oversight of Plaintiff's audits and investigations, and in the lead up to Plaintiff's request for the private session, Davies had repeatedly interfered with Plaintiff's efforts to investigate potential fraud. (*Id.* at ¶¶ 50–51, 60). As examples of this interference, Plaintiff alleges that on multiple occasions, Davies attempted to unilaterally strike Board-approved internal audits, including Plaintiff's scheduled audit of Vendor C. (*Id*. at ¶ 52).

During the private session with the Board, Plaintiff distributed handouts to the Board and cautioned that Safe Auto should defer its planned IPO based on several increased risks that he discovered after submitting his 2018 enterprise risk assessment, including that of felony fraud by the CIO and possibly others in management. (*Id.* at ¶¶ 54–55). Plaintiff requested authorization to commence formal audits of Safe Auto's relationships with the Vendors, after which he would present further findings. (*Id.* at ¶ 57). He also informed the Board that his finding might require him to update the enterprise risk assessment he had prepared in anticipation of the IPO. (*Id.* at ¶ 58). Plaintiff asked that the Board, rather than Davies, oversee the audit, openly questioning why Davies had been opposing his audits and investigations. (*Id.* at ¶¶ 59, 61). The Board granted Plaintiff's request. (*Id.* at ¶ 62). Then, approximately two weeks after the private session, Defendants removed enterprise risk assessment from Plaintiff's responsibilities. (*Id.* at ¶ 64).

On the evening of January 5, 2020, Plaintiff sent Graves two written reports: one concerning the allegations of stolen code and one concerning the alleged kickbacks to Vendor A. (*Id.* at ¶¶ 89–91).  Plaintiff refers to these reports as preliminary.  The first preliminary report stated

that Plaintiff was unable to substantiate allegations that Safe Auto vendors had stolen code from the Company and the second reiterated Plaintiff's suspicion that the CIO, and possibly others in management, had received illegal kickbacks from Vendor A. (*Id*. at ¶ 90, 91). Plaintiff had previously explained to Graves that he required additional information to complete his investigation. (*Id.* at ¶ 93). Around this time, Plaintiff also submitted status updates on his investigations and audits of Vendors B, C, and D. (*Id.* at ¶ 94). Plaintiff intended to continue his investigation and audit of Vendor A, and to submit an updated preliminary report nine days later, on January 14. (*Id.* at ¶ 95). The finalized report was not due until at the earliest, February 21, 2020. (*Id.* at ¶ 99).

Defendants terminated Plaintiff on January 6, 2020, the morning after Plaintiff sent Graves the preliminary reports. (*Id.* at ¶ 100). Graves informed Plaintiff that Plaintiff had lost management's confidence. (*Id.*). When Plaintiff pressed Graves for further explanation, Graves stated that the Board planned to terminate Plaintiff almost immediately after the July 2019 Board meeting. (*Id.* at ¶ 101–02).

On March 27, 2020, Plaintiff filed suit against Defendants in this Court. (ECF No. 1).

## II.

Federal Rule of Civil Procedure 12 authorizes dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To meet this standard, the complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion to dismiss, the Court construes the complaint in the light most favorable to

the non-moving party, accepting as true all of plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Nonetheless, the Court must read Rule 12(b)(6) in conjunction with Federal Rule of Civil Procedure 8(a), requiring a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 907 (S.D. Ohio 2013). Thus, the pleading's factual allegations, assumed to be true, must do more than create mere speculation or suspicion of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Further, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 662. As such, while a plaintiff is not required to set forth detailed factual allegations at the pleading stage, a complaint must contain a basis upon which relief can be granted; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *See id.* at 679; Fed. R. Civ. P. 8(a).

## III.

Defendants move to dismiss all claims under Rule 12(b)(6).

**A. The Ohio Whistleblower Statute**

Plaintiff claims that he was protected by the provisions of Ohio Revised Code § 4113.52, the Ohio Whistleblower statute, and that Defendants retaliated against his protected actions in violation of said statute. (Amend. Compl. at ¶¶ 106, 111). The two relevant protective provisions of the statute are § 4113.52(A)(1)(a) and (A)(3). The first of these provisions, § 4113.52(A)(1)(a), provides:

> If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is . . . a felony . . .

5

> the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority . . . .

The second provisions, Ohio Revised Code § 4113.52(A)(3), provides:

> If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, . . . and the employee reasonably believes that the violation is a criminal offense that is . . . a felony, . . . the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

In division (B), § 4113.52 continues:

> [N]o employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(1) or (2) of this section, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under either such division. No employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(3) of this section if the employee made a reasonable and good faith effort to determine the accuracy of any information so reported, or as a result of the employee's having made any inquiry or taken any other action to ensure the accuracy of any information reported under that division.

Ohio Rev. Code § 4113.52(B).

### 1. Written Report

Defendants first argue that Plaintiff cannot state a claim under the Ohio Whistleblower statute because Plaintiff did not submit a written report with sufficient detail to identify and describe a felony crime. (Mot. at 5, ECF No. 22). Specifically, Defendants contend that Plaintiff's preliminary report constitutes the "written report" for purposes of the statute, but that the preliminary report is insufficiently detailed. (*Id.* at 5–6). Plaintiff responds that it is unnecessary to determine whether the written report was sufficiently detailed because it was only a preliminary

6

report and that he was terminated while preparing the final written report. He argues that the sufficiency requirement only applies where a plaintiff is given an opportunity to file a written report and explains that Plaintiff was terminated before his final written report came due. (Resp. at 7, ECF No. 25). Plaintiff argues in the alternative that the preliminary report is sufficiently detailed to satisfy the statutory requirements. (*Id.* at 11–12). The Court finds it unnecessary to address the alternative argument because his first argument prevails.

Both asserted provisions of the Ohio Revised Code, § 4113.52, (A)(1)(a) and (A)(3), have the same starting procedural requirements. First, the employee must orally notify a superior of the violation. Ohio Rev. Code § 4113.52 (A)(1)(a), (A)(3). Plaintiff's completion of that step is not presently disputed. Second, the employee must file with that superior a "written report" that "provides sufficient detail to identify and describe the violation." *Id.* Provision (A)(1)(a) alone then includes a third step, wherein the employer must fail to correct the violation or make a reasonable and good faith effort to correct the violation before the employee may blow the whistle to outside authorities. Ohio Rev. Code § 4113.52 (A)(1)(a). These requirements must be taken in turn, as the failure to "strictly comply" prevents the employee from claiming the statute's protection. *Contreras v. Ferro Corporation*, 73 Ohio St.3d 244, 652 N.E.2d 940 (Ohio 1995) (Syllabus ¶ 1). For instance, in *Contreras* the employee was not entitled to protection because he never took steps one or three (notifying a superior and non-correction of the illegality by the employer), and only took step two of filing a written report after having already involved outside authorities. *Id.* at 249.

The Ohio Whistleblower statute is silent as to whether "a written report" means the first written report, even where the employer is on notice that the employee is still investigating and will be supplementing that report at a later date. Ohio Rev. Code § 4113.52 (A)(1)(a), (A)(3). The

statute also does not elaborate on what sort of detail is "sufficient" to identify and describe a violation. *Id.*

Here, Plaintiff's allegations show that he was following the process laid out in the Ohio Whistleblower statute when he was terminated from his position. He provided oral notification to Graves and submitted two written reports to Graves the day before he was terminated. (Amend. Compl. at ¶ 37, 89, 99–100). Plaintiff alleges that prior to submitting these two "preliminary reports", he had informed Graves that he required additional information to complete his investigation and planned to supplement his reports. (*Id.* at ¶ 93). Moreover, Plaintiff alleges that the reports were submitted to Graves over a month before the final report was due to be sent to the Board. (*Id.* at ¶¶ 89, 93, 99).

On its face, the Whistleblower statute does not specify that submitting a preliminary written report about a potential fraud precludes the employee from later filing a final report that contains more detail, and Defendants have not submitted any case law that reads such a restriction into the statute.

### 2. "Fellow Employee" or "Authority to Correct"

Next, Defendants argue that Plaintiff has not identified the types of conduct that the Ohio Whistleblower statute protects. Defendants argue that Plaintiff has not identified a "fellow employee" that Plaintiff reasonably believed committed a felony. (Mot. at 4, ECF No. 22 (citing Ohio Rev. Code § 4113.52(A)(3)). Plaintiff responds that the "fellow employee" language only applies to provision (A)(3), while his claim is cognizable under that provision and provision (A)(1)(a), which does not include the "fellow employee" language. (Resp. at 12, ECF No. 25). Plaintiff further asserts that the Amended Complaint "identified multiple fellow employees engaged in fraudulent conduct – namely the CIO, Davies, and others in management." (*Id.* (citing

8

Amend. Compl. at ¶¶ 35–38, 55, 61, 91–96, 110)). Lastly, Plaintiff argues that Defendants had the "authority to correct" the violation, as required for protection under provision (A)(1)(a). (*Id.*). In reply, Defendants state that a former employee is not a "fellow employee" and that provision (A)(1)(a) does not apply because Defendants did not have the "authority to correct" the alleged felonious violations of the CIO or the implicated Vendors. (Reply at 4–5, ECF No. 28).

Defendants focus on the CIO's termination as the basis for asserting that the CIO was not a fellow employee. The investigation, however, focused on the CIO's alleged violations while still employed by Safe Auto. Moreover, the CIO's termination was apparently related to the contracts with the Vendors being investigated. When Plaintiff began his investigation, the CIO was a fellow employee. Then, the same month that Plaintiff provided Graves with oral notice of the violation, the CIO was terminated. The Amended Complaint does not specify whether the CIO was terminated before or after Plaintiff provided the oral notice but does mention the oral notice first. Given the order in which these events are stated, at this stage in the proceedings it is reasonable to infer that at the time Plaintiff provided oral notice the CIO was still a current and fellow employee.

Even if the CIO and Plaintiff were not fellow employees as required under § 4113.52(A)(3) of the Ohio Revised Code, Plaintiff has still stated a claim under § 4113.52(A)(1)(a). Defendants had the "authority to correct" the alleged violation, Ohio Rev. Code § 4113.52(A)(1)(a), even if, as they point out, they cannot themselves bring criminal charges or terminate the CIO again. (Reply at 6, ECF No. 28). They could have authorized the government to access the CIO's files. Alternatively, or at the same time, they could have attempted to correct the situation through civil litigation. Simply put, Defendants' hands were not tied.

9

### 3. Stepping Outside One's Duties

Defendants next argues that both of Plaintiff's claims should be dismissed because Plaintiff did not step outside his duties to investigate and report the violation. (Mot. at 11, ECF No. 22). Defendants cite case law assessing other anti-retaliation statutes for the proposition that such statutes typically do not protect employees who investigated the violation as part of their normal job duties. *See, e.g.*, *McKinnon v. L-3 Communs. Corp.*, 814 Fed. Appx. 35, 42–43, 2020 U.S. App. LEXIS 15494 (6th Cir. 2020). The stated rational is that extending these statutes to cover such employees' normal job duties would cloak nearly all of their work in protection, make their discharge a litigation-prone endeavor. *Id.* Plaintiff responds that it would be premature to rule on the scope of Plaintiff's job duties based on the Amended Complaint alone, but that even so Plaintiff did not investigate the violation as part of his normal job duties or through normal channels. (Resp. at 13, 15, ECF No. 25). This Court agrees.

Based on the Amended Complaint it is plausible that Plaintiff stepped outside his normal duties during the course of his investigation. Plaintiff sought and received a private session with the Board outside of his supervisor's presence. At that meeting Plaintiff requested authorization to commence a formal audit, and for the Board, rather than Davies, to oversee it. (*Id.* at ¶¶ 57, 59). It is clear from the Amended Complaint that this process was not one in which Plaintiff regularly engaged. Thus, it is plausible that Plaintiff was stepping outside of his normal duties to engage in his investigation.

### B. The *Greeley* Claim

Defendants also move to dismiss Plaintiff's common law claim of wrongful discharge in violation of public policy. The parties refer to this as a *Greeley* claim, in reference to the case through which Ohio first recognized a public policy exception to the employment-at-will doctrine.

*Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 223–224, 551 N.E.2d 981, 986 (Ohio 1990).

A *Greeley* claim has four elements: clarity, jeopardy, causation, and an overriding justification. *Collins v. Rizkana*, 73 Ohio St. 3d 65, 69–70, 652 N.E.2d 653, 657–58 (Ohio 1995). Put fully, Plaintiff must show:

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The Plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Id.* (quotations omitted). The first two of these elements, clarify and jeopardy, are "questions of law to be determined by the court." *Id.* at 70.

Plaintiff claims that Defendants discharged him in violation of Ohio's "public policies against corporate fraud and in favor of the investigation and reporting of such fraud by employees, as reflected by, *inter alia*, the Ohio Whistleblower Act and Chapter 2913 of the Ohio Revised Code." (Amend. Compl. at ¶ 116, at ECF No. 7).

Defendants assert that Plaintiff cannot satisfy the clarity element of his *Greeley* claim because Plaintiff has failed to meet the whistleblower requirements of Ohio Revised Code § 4113.52 and thus "cannot state a claim based upon the public policy stated in it." (Mot. at 8, ECF No. 22). Defendants also assert that Chapter 2913 cannot support Plaintiff's *Greeley* claim because it fails the clarity and jeopardy elements. (*See* Mot. at 9–11). However, for the reasons stated above

11

Plaintiff's § 4113.52 claim against Safe Auto plausibly meets the whistleblower requirements of that statute. Thus, Defendants' argument related to the Whistleblower Act fails.

Because the Whistleblower statute provides an independent basis for Plaintiff's *Greeley* claim, the Court need not address Defendants' arguments related to Chapter 2913. *See Kulch v. Structural Fibers*, 78 Ohio St. 3d 134, 156, 161 (Ohio 1997) (recognizing a *Greeley* claim for tortious wrongful discharge in violation of the Ohio Whistleblower statute).

### C. Davies

Lastly, Defendants move specifically for dismissal of the claims against Davies.

#### 1. Individual Liability and The Ohio Whistleblower Statute

Defendants move for the dismissal of Davies on the grounds that he cannot be held individually liable under the Ohio Whistleblower statute. (Mot. at 13, ECF No. 22). Defendants cite precedent for the proposition that the statute creates liability for the corporate entity but not individual supervisors. *See, e.g.*, *Keehan v. Korenowski*, 2017-Ohio-7050, ¶ 15, 95 N.E.3d 781, 786 (Ohio Ct. App. 2017); *Armstrong v. Trans-Service Logistics, Inc.*, 2005-Ohio-2723, ¶ 43 (Ohio Ct. App. 2005); *Keehan v. Certech, Inc.*, No. 5:15-cv-1236, 2015 WL 8483179, *4 (N.D. Ohio Dec. 10, 2015) ("*Keehan* (N.D.)").

Plaintiff responds by submitting that the aforementioned cases were wrongly decided. He relies on *Naples v. Rossi* to assert that courts have reached the opposite conclusion, but his reliance on *Naples* is misplaced. 2005-Ohio-6931, ¶ 36 (Ohio Ct. App. 2005). *Naples* did not concern the issue of individual liability. Rather, there the court determined a mayor is an employer, not a fellow employee, when deciding whether appellant had shown wrongdoing by a "fellow employee," as necessary under Ohio Revised Code § 4113.52(A)(3). *Id.*

In *Keehan*, 95 N.E.3d at 786, and *Armstrong*, 2005-Ohio-2723, ⁋ 43, Ohio appellate courts held that there is no liability for individual supervisors under the Ohio Whistleblower statute.

> As noted by the Sixth Circuit, "[w]here a state appellate court has resolved an issue to which the high court has not spoken, 'we will normally treat [such] decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently.' " *Swix v. Daisy Mfg. Co., Inc.*, 373 F.3d 678, 681 (6th Cir. 2004) (alterations in original) (citations omitted). A decision of a state's intermediate appellate court, "while lacking the controlling force of a decision of a state court of last resort, does serve as 'a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997) (quoting *Ziebart Int'l Corp. v. C NA Ins. Cos.*, 78 F.3d 245 (6th Cir. 1996)).

*Keehan* (N.D.), 2015 WL 8483179, *4.

Plaintiff has not persuaded this Court that the Ohio Supreme Court would reach a contrary holding to *Keehan* and *Armstrong*. This Court normally applies the law of Ohio "in accordance with the then controlling decision of the highest state court." *United States v. Anderson County, Tennessee,* 761 F.2d 1169, 1173 (6th Cir.1985); *see also Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1485 (6th Cir.1989).

Accordingly, the Court concludes that Plaintiff has failed to state a claim for individual liability against Davies under the Ohio Whistleblower statute.

### 2. The *Greeley* Claim Against Davies

The Court now returns to Defendants' argument that the *Greeley* claim should be dismissed. This Court has already rejected that argument as it relates to Safe Auto, supra. The analysis is different for the *Greeley* claim against Davies, for Plaintiff cannot state a claim against

13

Davies under the Ohio Whistleblower statute. Plaintiff pleaded his *Greeley* claim based on Ohio's "public policies against corporate fraud and in favor of the investigation and reporting of such fraud by employees, as reflected by, *inter alia*, the Ohio Whistleblower Act and Chapter 2913 of the Ohio Revised Code." (Amend. Compl. at ¶ 116, ECF No. 7). Plaintiff's *Greeley* claim against Davies now depends on Chapter 2913 of the Ohio Revised Code. That Chapter criminalizes various types of theft and fraud over the span of thirty-four sections. *See, e.g.*, Ohio Rev. Code § 2913.02(A)(3) ("No person, with purpose to deprive the owner of property . . . , shall knowingly obtain . . . the property . . .by deception[.]").

Defendants assert that Plaintiff's reference to Chapter 2913 is vague and does not provide a clear manifestation of public policy upon which Plaintiff can rely, and that either way Plaintiff's termination did not jeopardize that public policy because Defendants lacked notice of it. (*See* Mot. at 9–11). Plaintiff posits that Chapter 2913 does contain clear public policies against corporate fraud and in favor of investigation. (Resp. at 16, ECF No. 25). According to Plaintiff the alleged "kickbacks" amount to felony theft by deception under § 2913.02 of the Ohio Revised Code. (*Id.*).

Ohio courts require a proffered public policy to "parallel Ohio's Whistleblower statute," in order to satisfy the clarity element of a *Greeley* claim. *See, e.g.*, *Hale v. Volunteers of America*, 158 Ohio App.3d 415, 427–28, 2004-Ohio-4508 (Ohio Ct. App. 2004). "To parallel that statute, the policy on which the plaintiff relies must (1) impose 'an affirmative duty on the employee to report a violation, (2) specifically prohibit employers from retaliating against employees who had filed complaints, or (3) protect the public's health and safety.'" *Hale v. Mercy Health Partners*, 617 Fed. Appx. 395, 403 (6th Cir. 2015) (quoting *Dean v. Consol. Equities Realty #3, L.L.C.*, 182 Ohio App.3d 725, 729, 2009-Ohio-2480 (2009)) (brackets omitted). Plaintiff has not demonstrated that the public policy he proffers fits into any of these categories.

14

Plaintiff has not referenced, and this Court has not found, any relevant provision of Chapter 2913 or Section 2913.02 which either imposes an affirmative duty on the employee to report fraud or specifically prohibits employers from retaliating against an employee who filed a complaint. Instead, Plaintiff cites precedent for the proposition that a *Greeley* claim can exist independent from any law that requires reporting or prohibits retaliation. *See, e.g.*, *Pytinski v. Brocar Prods., Inc.*, 94 Ohio St. 3d 77 (Ohio 2002) (Syllabus at ¶ 1). While that is true, the expansion started by *Pytinski* was specific to workplace safety. *Id.* Indeed the proposition to which Plaintiff refers is actually the third category: "health and safety." *Hale* at 617 Fed. Appx. 403. Plaintiff has not demonstrated, and this Court does not see, how his investigation of corporate fraud relates to health and safety.

Without fitting any of the three categories, Plaintiff cannot satisfy the clarity element of his *Greeley* claim against Davies. Failure to satisfy the clarity element is dispositive, and thus the Court declines to address whether Plaintiff's termination jeopardized the public policy against fraud. (*See* Mot. at 11, ECF No. 22).

### D. Leave to Amend

Finally, Plaintiff requested leave to amend the Amended Complaint if the Court grants Defendant's motion. (Resp. at 20, ECF No. 25). Defendants oppose Plaintiff's request, asserting that any amendments would be futile. (Reply at 11, ECF No. 28). As an initial matter, the Court notes that Plaintiff's claims against Safe Auto survive Defendants' motion to dismiss. The Court is therefore uncertain that Plaintiff still wishes leave to amend. Regarding the claims against Davies, the Court agrees with Defendants that an amendment would be futile. *See, e.g.*, *Riverside Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 523 (6th Cir. 2010) (affirming denial of leave to amend where an amendment would have been futile). Plaintiff's claims against Davies

failed as a matter of law, not because they were insufficiently pleaded. As such, leave to amend would not change the outcome and is accordingly **DENIED**.

## IV.

For the reasons set forth above, Defendants' Motion to Dismiss Plaintiff's Complaint, (ECF No. 22), is **GRANTED** with respect to Plaintiff's claims against Davies, but **DENIED** in respect to Plaintiff's claims against Safe Auto. The Clerk is directed to terminate Davies from this case.

**IT IS SO ORDERED.**


2/8/2021                                                s/Edmund A. Sargus, Jr.
**DATE**                                          **EDMUND A. SARGUS, JR.**
                                                         **UNITED STATES DISTRICT JUDGE**